UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORMAN HOLMES,

       Plaintiff,

                           Case No. 06-10382
v.                           Judge Avern Cohn

ST. CLAIR COUNTY; PETER BIONDO;
ROBERT WALKER; WAYNE
SCHWARZ; CATHY STROH; MICHAEL
WITKOWSKI; MICHAEL LEBEAU; PHILIPS[1]
DAVID SZELOG; RANDY PLONKA; and
SHARON FURTAH; Jointly and Severally,

       Defendants.

_____/

## MEMORANDUM AND ORDER:
## (1) DENYING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFF'S EIGHTH AMENDMENT CLAIM
## (EXCEPT AS TO DEFENDANT STROH);
## (2) GRANTING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFF'S GROSS NEGLIGENCE CLAIM;
## (3) DENYING ST. CLAIR COUNTY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S MUNICIPAL LIABILITY CLAIM; AND
## (4) DISMISSING DEFENDANT PHILIPS

### I. INTRODUCTION

This is a case under 42 U.S.C. §1983.  Between January 26 and 28, 2004,

Plaintiff Norman Holmes (Holmes) suffered a severe stroke while incarcerated at the

St. Clair County Jail (the jail).  Holmes is suing the following corrections officers

(officers) and medical personnel for deliberate indifference to his medical needs in

---

[1]  Philip's first name is not provided.

1

violation of the Eighth Amendment: [2]

- Cathy Stroh (Stroh), Jail Supervisor in Training on duty from 6:00 p.m. on January 26 to 6:00 a.m. on January 27;

- Michael Witkowski (Witkowski), a guard on duty from 7:00 p.m. on January 26 to 7:00 a.m. on January 27;

- Wayne Schwartz (Schwartz), a jail supervisor on duty from 6:00 a.m. to 6:00 p.m. on January 27;

- Michael Labeau (LaBeau), a guard on duty from 7:00 a.m. to 7:00 p.m. on January 27;

- David Szelog (Szelog), a guard on duty from 7:00 a.m. to 7:00 p.m. January 27;

- Peter Biondo (Biondo), a jail supervisor on duty from 6:00 p.m. on January 27 to 6:00 a.m. on January 28.

- Robert Walker (Walker), a guard on duty from 7:00 p.m. to on January 27 to 7:00 a.m. on January 28;

- Randy Plonka, M.D.(Plonka), the jail physician

- Sharon Furtah (Furtah)[3], Plonka's medical assistant

- Philip.[4]

Holmes also claims gross negligence under the Michigan Tort Liability Act,

M.C.L. § 691.1407(2) against the individual defendants based on the same facts.

Finally, Holmes claims that St. Clair County (the County) is liable for policies, patterns or

practices which resulted in the violation of his Eighth Amendment rights. Holmes seeks

---

[2] The following dates refer to 2004.

[3] Furtah's last name is misspelled in Holmes' filings.

[4] No description of Philip is provided.

compensation for his medical expenses and rehabilitation, physical and mental pain and suffering, physical and mental disability, emotional distress, punitive damages, interest, and attorneys cost and fees.

Before the Court are the motions for summary judgment of (1) the County and the officers, (2) Plonka, and (3) Furtah. All claim qualified immunity. Alternatively, the defendants argue that Holmes' case should be dismissed because he cannot show that he was harmed by their actions.

For the reasons that follow:

(1) Holmes' Eighth Amendment violation claim will proceed against the individually named defendants, with the exception of defendant Stroh;

(2) Holmes' gross negligence claim will be dismissed, as Holmes did not respond to the defendants' motions for summary judgment on this issue;

(3) St. Clair County's motion for summary judgment on the issue of municipal liability will be denied; and

(4) Philip will be dismissed, as Holmes did not explain his alleged role in this matter.

## II. FACTUAL BACKGROUND

### A. Introduction

Plonka provides medical services to inmates at the jail under a contract with the St. Clair County Sheriff's Department (the contract).[5] Furtah has been his medical assistant for 18 years.

---

[5] It is unclear how long Plonka has provided medical services to the jail.

On January 12, 2004 Holmes began serving a 93 day sentence at the jail for driving under the influence of alcohol.

On January 17, 2004 Holmes complained of chest pains and was taken to Port Huron Hospital (the hospital). Holmes was diagnosed with hypertension and issued two prescriptions for medication. He was then released from the hospital and returned to the jail.

On January 28, 2004, Holmes was again taken to the hospital where he was diagnosed as having suffered a severe stroke. Holmes was hospitalized from January 28, 2004 to February 8, 2004, when he was transferred to Mercy Hospital Inpatient Rehabilitation Center for therapy. He has since undergone extensive physical and speech therapy.

The facts leading up to Holmes' second hospitalization form the basis for his claims and are highly disputed by the parties as reflected below.

### B. The County And The Officers' Version Of The Facts

On January 27, 2004, at 5:45 a.m., Holmes told Witkowski (a guard) that his left leg and arm felt numb during the night. Witkowski noted that Holmes appeared to have difficulty walking and opening his milk carton. Witkowski relayed Holmes' complaint and his own observations to Stroh who was training to be a supervisor. Stroh's shift was ending at 6:00 a.m. so she passed the information along to Schwartz the supervisor whose shift was about to begin. Schwartz immediately paged Plonka (the jail physician) and says that he passed on the information relayed to him by Stroh. Schwartz says that Plonka told him to keep an eye on Holmes; to have him move around; and to fill out a medical request form so that either he or Furtah (his medical assistant) would see

4

Holmes.  Schwartz told Witkowski to fill out a medical request form.  Witkowski says he did so at 6:10 a.m. and placed it in the appropriate box in the medical office.

At 6:45 a.m. an inmate told Witkowski that Holmes had been doing push-ups the night before and that something was wrong with him because he had to hold onto the walls in order to walk to the bathroom.  Witkowski says that he relayed this additional information to Schwartz who told him that the medical staff[6] had been contacted.  Witkowski's shift ended at 7:00 a.m.

Schwartz says that shortly after 9:00 a.m. Labeau (a guard) called him stating that Holmes was sitting on the floor and could not get up without assistance.  Schwarz says that he then learned that Furtah had been at the jail, but had just left without seeing Holmes.  Schwarz says that he immediately attempted to call Furtah on the Nextel system (which is a direct radio system) but could not reach her.  Schwarz says that he then called Plonka's office and talked to Furtah who told him to move Holmes to an observation cell.  Schwarz ordered Szelog (a guard)  and Labeau to move Holmes at approximately 10:00 a.m.  During the transport, Holmes stated that he had no feeling in his left arm and leg.  Holmes was placed into a wheelchair to move him.  Szelog observed that Holmes was having difficulty walking and was slurring his speech.  Szelog relayed all this information to Schwartz.  Schwartz says that he immediately called Plonka's office again, and told Furtah that Holmes was having difficulty walking and was slurring his words.  Schwartz says that Furtah told him that Plonka would see Holmes when he got in, which Schwartz believed would be later that day.

---

[6]  It is undisputed that "the medical staff" refers to Plonka and Furtah.

Biondo took over as supervisor at 6:00 p.m.  Biondo says that Schwartz told him that he had contacted the medical staff three times about Holmes and that he would be seen in the morning unless his condition changed dramatically during the night.  Biondo says that Holmes did not make any complaints about being in pain and was asleep for much of the night.

The next morning (January 28, 2004) before 7:00 a.m., Walker (a guard) says that Holmes complained of not being able to get off the floor and stated that he had been awake the entire night.  Walker observed that Holmes had difficulty walking and had numbness in his mouth and leg.  Walker also says that Holmes requested to use the phone which he allowed him to do.[7]

At approximately 8:00 a.m. that day, Plonka examined Holmes and told the guards on duty that he should be taken to the hospital.  Holmes was sent to the hospital where it was determined that he had suffered from a severe stroke.

### C.  Plonka And Furtahs' Version Of The Facts

 Plonka says that at approximately 6:00 a.m. on January 27, 2004, he received a page from Schwarz who told him that Holmes had been exercising and doing pushups throughout the night, and was now complaining that his left arm was numb.  Based on this information, Plonka concluded that Holmes' condition was musculoskeletal in nature.  Plonka says that he asked Schwarz to move Holmes to an observation cell but that he did not believe from the information he had that Holmes' condition was serious.

---

[7]  Holmes stated at his deposition that he called his wife and told her to get him medical help.  He says that his wife called the jail and someone told her that Holmes looked fine and was walking around.  This is not mentioned in the briefs.

Plonka drove Furtah to the jail at 7:00 a.m. Plonka typically dropped Furtah off at the jail every week-day morning so that she could review medical requests and organize his files for his visits. Plonka sees prisoners at the jail on Mondays, Wednesdays, and Fridays. Plonka says that he mentioned to Furtah that he had gotten a page about Holmes and relayed to her what Schwartz had told him. Plonka says that neither he, nor Furtah or anyone at his office, got any calls from any of the officers regarding Holmes for the rest of the day.[8]

Plonka saw Holmes the next morning and immediately concluded that he had already had or was in the middle of having a stroke. He ordered the officers to take Holmes to the hospital. Plonka says that he was surprised and angry that no one had told him or Furtah what was happening to Holmes.

Furtah says that she worked at the jail medical office from 7:00 a.m. to 9:00 a.m. on January 27, 2004 and that she did not see a medical request slip regarding Holmes in the boxes where they are typically placed by the officers. Furtah says that she received no calls from the jail about Holmes and denied speaking to Schwarz that day. Furtah also says that Plonka did not give her any instructions regarding Holmes.

### D. Holmes' Version Of The Facts

Holmes says that talked to Witkowski early in the morning on January 27, 2004 and told him that his left arm and leg were numb .

Holmes says that after he was moved to the observation room he asked any officer he could get the attention of to be taken to the hospital or to see the medical

---

[8] No phone records are included in the record.

staff. Holmes believes that he requested medical attention at least 10 times. Holmes says that he became increasingly frightened throughout the day and believed he might be having a stroke or heart attack.

Holmes also says that he told one officer who was walking by the observation cell that he believed he was having a stroke. He says that the officer grunted or snorted and said "I can guarantee you right now you ain't having no stroke." Holmes says that this same officer went into the "corporal's office" (which was visible from the observation cell) and made fun of him by placing his hands over his head, dancing around in a circle and saying "look at me I'm having a stroke" while laughing. He says that the person sitting at the desk laughed. Although Holmes does not identify the officer who made fun of him, he believes the person sitting at the desk was either Schwarz or Biondo.

Holmes says that sometime between lunch and dinner Szelog told him that Schwartz had made up his mind that he was not going to see the doctor or go to the hospital that day and that someone would see him later.

Holmes says that Plonka saw him at approximately 8:00 a.m. the next morning and ordered the officers to transport him to the hospital. Holmes says they waited approximately two more hours before taking him to the hospital.

### III.  SUMMARY JUDGMENT

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. <u>See</u> <u>Moore v. Philip Morris Co.</u>, 8 F.3d 335, 340 (6th Cir. 1993); <u>see also</u> <u>Anderson</u>, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. <u>Bsharah v. Eltra Corp.</u>, 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." <u>In re Dollar Corp.</u>, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986)). The Court "must view the evidence in the light most favorable to the non-moving party." <u>Employers Ins. of Wausau v. Petroleum Specialties, Inc.</u>, 69 F.3d 98, 101 (6th Cir. 1995).

## IV. ANALYSIS

**A. Whether The Officers And Medical Personnel Are Entitled To Summary Judgment**

**1. The Standard**

Section 1983 creates no substantive rights on its own; rather, it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or federal law.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  "To successfully establish a claim under section 1983, a claimant must show that he or she was deprived of a right secured by the Constitution and the laws of the United States by one acting under the color of law."  Ahlers v. Schebil, 188 F.3d 365 (6th Cir. 1999) (internal citations omitted).

The Eighth Amendment's prohibition of cruel and unusual punishment places restraints on prison officials, including prohibiting "deliberate indifference to serious medical needs of prisoners."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  The indifference may be manifested by prison doctors in their response to the prisoners needs or by prison guards intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Id. at 104-105.

A claim that a prison official was deliberately indifferent to a prisoner's need for adequate medical care has both an objective and a subjective component:

> The objective component of the test requires the existence of a "sufficiently serious" medical need.  Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir.2004). A sufficiently serious medical need is predicated upon the inmate demonstrating that he or she "is incarcerated under conditions imposing a substantial risk of serious harm." Id. (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970).
> The subjective component, by contrast, requires a showing that the prison official possessed "a sufficiently culpable state of mind in denying medical care." Id. (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970).

> Deliberate indifference requires a degree of culpability greater than mere negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." <u>Farmer</u>, 511 U.S. at 835, 114 S.Ct. 1970. The prison official's state of mind must evince "deliberateness tantamount to intent to punish." <u>Horn v. Madison County Fiscal Court</u>, 22 F.3d 653, 660 (6th Cir.1994). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." <u>Id</u>. Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." <u>Farmer</u>, 511 U.S. at 838, 114 S.Ct. 1970.

<u>Miller v. Calhoun County</u>, 408 F.3d 803, 812-13 (6th Cir. 2005):

The individual defendants claim qualified immunity. The Supreme Court has held that "prison officials who actually knew of a substantial risk to inmate health of safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer</u>, 511 U.S. at 844.

**2. Whether Holmes Has Established That He Had A "Sufficiently Serious" Medical Need (The Objective Component)**

**a. Arguments**

The defendants argue that Holmes has failed to establish he had a "sufficiently serious" medical need because he failed to provide verifying medical evidence" to establish the detrimental effect of delay in medical treatment, as required by <u>Napier v. Madison County</u>, 238 F.3d 739, 742 (6th Cir. 2001).

The defendants rely upon the affidavit of Dr. William Leutcher, a neurologist, who concludes that earlier treatment would not have affected the degree or duration of the impairments Holmes suffered as a result of the stroke. Dr. Leutcher opined that the timing of events and the nature and size of the stroke suffered by Holmes were such

that earlier treatment would not have mattered.  In his opinion nothing could have been done to avert Holmes' injuries.

Holmes counters the defendant's argument with the affidavit of Dr. Timothy Broe. Dr. Broe concludes that:

> In my opinion, earlier intervention [on] January 27, 2004 at 6:00 a.m. would have placed Mr. Holmes into a level one trauma center where pain medication and blood thinners would have allayed pain, suffering and his fears of impending death.  Failure to convey in my opinion was deliberately indifferent and impaired his ability to more fully recover.
> The earlier a stoke patient is administered to, the greater prospect he will have to more fully recover.  This is an axiom that I believe holds true in this case.

The defendants argue that Dr. Broe's affidavit is insufficient to create a genuine question as to whether Holmes suffered from the delayed medical treatment because Dr. Broe is not a medical doctor, but instead has a doctorate in rehabilitative counseling. Therefore, he is not qualified to refute Dr. Leutcher's testimony.  Second, the defendants argue that Dr. Broe, in fact, does not refute Dr. Leutcher's conclusion.

Holmes responds that he does not need to establish the detrimental effect of the delay in his medical treatment because his medical need was obvious.  Holmes relies on Blackmore v. Kalamazoo County, 390 F.3d 890, 897 (6th Cir. 2004), which clarified that the holding in Napier requiring evidence of detrimental effect of delay, applies only to those claims involving minor maladies or non-obvious complaints of a serious need for medical care.  However, a claimant can establish that a medical need is objectively serious without presenting verifying evidence where the condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a

lay person would easily recognize the necessity for a doctor's attention." Id. at 899-900

(emphasis added).  The Blackmore court explained that:

> As the Supreme Court has held, the test for deliberate indifference is
> whether there exists a "substantial risk of serious harm," Farmer, 511 U.S.
> at 837, 114 S.Ct. 1970 (emphasis added), and does not require actual
> harm to be suffered. See also Smith v. Carpenter, 316 F.3d 178, 189 n. 15
> (2d Cir.2003) (observing that "actual physical injury is not necessary in
> order to demonstrate an Eighth Amendment violation" and declining to
> adopt a per se rule that such injury is required) (citing in part Helling v.
> McKinney, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).
> Where the seriousness of a prisoner's needs for medical care is obvious
> even to a lay person, the constitutional violation may arise. This violation
> is not premised upon the "detrimental effect" of the delay, but rather that
> the delay alone in providing medical care creates a substantial risk of
> serious harm. When prison officials are aware of a prisoner's obvious and
> serious need for medical treatment and delay medical treatment of that
> condition for non-medical reasons, their conduct in causing the delay
> creates the constitutional infirmity. In such cases, the effect of the delay
> goes to the extent of the injury, not the existence of a serious medical
> condition.

390 F.3d at 899 (emphasis added).

### b.  Resolution

Holmes does not need to produce evidence of actual harm to proceed because

he has established that there exists a genuine issue of fact as to whether it would be

obvious to a layperson that he had a serious need for medical treatment.  "When prison

officials are aware of a prisoner's obvious and serious need for medical treatment and

delay medical treatment of that condition for non-medical reasons, their conduct in

causing the delay creates the constitutional infirmity."  Blackmore, 390 F.3d at 899   It is

undisputed that several of the officers who observed Holmes knew that he had been

hospitalized with chest pains just a week and a half before he complained of numbness

in his left arm and leg, and that he could not get off the floor without help.  Several

officers personally observed, and stated that they told their supervisors that Holmes could not walk, had to use the walls to hold himself up, had to be transported by wheelchair to the observation room, could not open up a milk carton, and was slurring his words. Holmes says that he requested medical attention on at least 10 times and he says he told one officer that he believed he was having a stroke or a heart attack. Considering all this, it is for the fact finder to determine whether any or any combination of these symptoms would have indicated to a reasonable layperson that Holmes had an obvious need for medical treatment.

### 3. Whether Holmes' Has Established That Any Of The Officers Or Medical Personnel Were Deliberately Indifferent To His Medical Needs

### a. The Officers

The officers argue that each of them acted reasonably under the standards provided by the contract between the jail and Plonka. They argue that the contract establishes that medical decision-making was delegated to the medical staff. Their duty was simply to relay information promptly and fully to the medical staff and to follow any instructions they are given. The officers also argue that they must defer to the medical staff's directions regarding treatment. They point out that the contract states in pertinent part that:

• The extent of the medical service provided to the inmate will be at the discretion of the contracted medical personnel.

• It is the responsibility of the corrections officer to: bring to the attention of the supervisor any medical problems he/she is aware of.

• It is the responsibility of the corrections supervisor to: contact the physician or nurse in case of emergencies and follow their directions

&bull; Emergency Medical Treatment: Medical staff will be immediately notified should a injury occur to an inmate, staff member, or others as a result of the use of physical force, chemical agent, or any event, accident, fight, etc. Dr. Plonka will be immediately notified of the type of injury or medical problems. Dr. Plonka will determine the need for medical examination. Dr. Plonka will give direction how to proceed with treatment. Port Huron Hospital will be used for any hospitalization needs. If medical personnel are not available, the inmate is to be taken to Port Huron Hospital immediately for examination.

The officers argue that they acted reasonably because each acted in accordance with the contract, and therefore each is entitled to summary judgment.

Holmes responds that summary judgment is inappropriate because there exists questions of material facts as to whether the officers relayed Holmes' condition to Plonka and Furtah promptly and completely.

Holmes also argues that even if a fact-finder believes the officers' testimony that they promptly and completely relayed his condition to Plonka and Furtah, the officers could still be found liable because there is evidence that each officer has the ability to send prisoners to the hospital without permission from the medical staff in emergency situations. Holmes points out that while Schwartz and Biondo testified that it was "protocol" to contact the medical staff first, Plonka testified that the jail supervisors knew that they could send a prisoner to the hospital without permission in certain emergency situations. In particular, Schwartz testified at deposition that he had sent prisoners to the hospital without first contacting Plonka on several occasions. Holmes also points out that Szelog testified that <u>any</u> officer could transfer a prisoner to the hospital in an emergency situation.

Each officers' alleged actions is analyzed below.

**Witkowski:**

Witkowski is a guard.  Witkowski says that his actions were not deliberately indifferent to Holmes' medical needs because after Holmes told him that he was experiencing numbness in his left arm and leg at approximately 5:45 a.m., and he observed that Holmes was having trouble walking and could not open his milk carton, he immediately spoke with Stroh, who passed his information along to Schwartz. Witkowski says that he filled out a medical form and placed it in the appropriate box at approximately 6:10 a.m.  Witkowski says that a few minutes later an inmate told him that Holmes had been doing pushups during the night and had to hold onto the wall to go to the bathroom. Witkowski says he passed this information along to Schwarz, who told him that the medical staff had been alerted.   Witkowski then went off duty at 7:00 a.m.

Witkowski is not entitled to qualified immunity because there is a fact dispute as to whether Witkowski filled out the medical request and placed it in the box as Schwartz ordered him to.  Furtah testified that there was no medical request in the box when she checked it later that morning.  Therefore, a fact-finder could determine that Witkowski was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

**Stroh:**

Stroh is a supervisor in training.  Stroh argues that her actions were not deliberately indifferent to Holmes' medical needs because she immediately relayed the information Witkowski gave her to Schwartz.  Stroh says this action was reasonable

because her shift was ending in a few minutes.  Stroh says that Schwarz had paged the medical staff right before she left.

Stroh is entitled to qualified immunity because there is no genuine issue of fact as to whether Stroh was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical attention.  To the contrary, she left the jail shortly after personally observing Schwartz contact the medical staff.  She received no further information regarding Holmes' condition.

### Schwartz:

Schwartz is a supervisor.  Stroh relayed to Schwartz the information she received from Witkowski at 6:00 a.m.  Schwartz argues that he was not deliberately indifferent to Holmes medical needs because he immediately called Plonka and told him that Holmes was experiencing numbness, was having difficulty walking, and could not open his carton of milk.  Schwartz says that he followed Plonka's instructions to have someone fill out a medical request and to have Holmes move around.

Next, Schwartz says that he called and spoke to Furtah immediately after Labeau told him that Holmes was on the floor and could not get up.  He says he followed Furtah's instructions to move Holmes to an observation cell.  Finally, Schwartz says that when Slezog told him that Holmes was having trouble walking and slurring his words and had to be transported by wheelchair to the observation cell, he immediately called Furtah again.  He says that Furtah told him that Plonka would see him when he arrived.  Schwartz says that he believed Furtah meant that Plonka would be coming that day.  Schwartz also says that he did not know if there was a medical emergency because he was relying on Furtah and Plonka's instructions.

17

Schwartz is not entitled to qualified immunity because Holmes has established that there are genuine issues of fact as to whether he relayed the information he had received from other officers to Plonka and Furtah. Plonka says that Schwartz did not tell him that Holmes had leg numbness, was having difficulty walking or could not open a milk carton. Furtah denies that she received any phone calls from Schwartz. Therefore, a fact-finder could determine that Schwartz was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

Second, there is also a fact dispute as to whether Schwartz had the ability to send Holmes to the hospital in an emergency situation, and whether it would have been obvious from the information he received <u>throughout</u> his shift that Holmes was in serious need of medical treatment. Therefore, a fact-finder could determine that Schwartz was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

**Szelog:**

Szelog is a guard. Szelog says that the only contact he had with Holmes was when he helped transport him to the observation cell at 10:00 a.m. with Labeau. Szelog says that he was not deliberately indifferent to Holmes' medical needs because he promptly reported to Schwartz that Holmes was having difficulty walking and was slurring his words.

Holmes says that Szelog physically mistreated him by dumping him from the wheelchair "like dirt from a wheel barrel." Holmes also says that Szelog was assigned

18

to watch him and that Holmes asked him to send him to the hospital. Homes says that his request were ignored and that Szelog did not relate his requests to his supervisor.

Szelog is not entitled to qualified immunity because Holmes has established that there exist genuine issues of fact as to whether Szelog physically mistreated him and whether he promptly and accurately relayed to his supervisor Holmes' complaints and request for medical attention. Therefore a fact-finder could find that Szelog was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

There is also a fact dispute as to whether Szelog had the ability to send Holmes to the hospital in an emergency situation, and whether Holmes' situation constituted an emergency. Moreover, there is a fact dispute as to whether it would have been obvious to Szelog from his observations throughout his shift that Holmes had a serious medical need. Therefore, a fact-finder could determine that Szelog was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

**Labeau:**

Labeau is a guard. Labeau says he was not deliberately indifferent to Holmes' medical needs because he promptly relayed to Schwartz that Holmes told him that he could not get off the floor. He says that his only other contract with Holmes was helping transport him to the observation cell at 10:00 a.m. Szelog.

Holmes says that Labeau physically mistreated him physically mistreated him by dumping him from the wheelchair "like dirt from a wheel barrel" even though he observed that Holmes could not walk, and was slurring his words. Also, it appears that

Labeau did not relay to Schwartz his observations that Holmes could not walk and was slurring his words.

Labeau is not entitled to qualified immunity. There exists a fact dispute as to whether Labeau was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

**Walker:**

Walker is a guard.  Walker says that he was not deliberately indifferent to Holmes' medical needs because he told Biondo that Holmes said on the morning of January 28, 2004 that he was unable to get off the floor and had been awake the entire night.  Walker says that he also told Biondo that Holmes appeared to have difficulty walking and numbness in his mouth and leg.  Walker says that soon after he relayed this information to Biondo, Plonka saw Holmes.

Holmes says that Walker was assigned to observe him most of the night, and that he made multiple complaints about his health and requested to see a doctor many times.  He points out that Walker states in his deposition testimony that he asked Biondo four different times why Holmes had not been taken to the hospital or seen by a Doctor.  Biondo, in contrast, says he was not told that Holmes had any complaints throughout the night and had been told that Holmes was sleeping.

Walker is not entitled to qualified immunity because there is a genuine issue of fact as to whether Holmes complained to him or requested medical attention, and whether he promptly and accurately relayed this information to his supervisor. Therefore a fact-finder could determine that Walker was aware that Holmes had a

serious medical need and acted indifferently by delaying or denying his access to medical care.

There is also a fact dispute as to whether Walker had the ability to send Holmes to the hospital in an emergency situation, and whether Holmes' situation constituted an emergency. Moreover, there is a fact dispute as to whether it would have been obvious to Walker from Holmes complaints and requests and his own observations throughout his shift that Holmes had a serious medical need. Therefore, a fact-finder could determine that Walker was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

**Biondo:**

Biondo acted as supervisor from 6:00 p.m. on the evening of January 27, 2004 to 6:00 a.m. the next morning. Biondo says that he was not deliberately indifferent to Holmes' medical needs because when he started his shift, Schwartz told him the medical staff had been contacted three times and that they would see him in the morning unless Holmes' condition changed dramatically. Biondo says that no officer reported complaints through the night and that he was told that Holmes was sleeping most of the night. Therefore, Biondo says that he had no reason to believe Holmes' condition worsened during his shift.

Holmes points out that Walker stated in his deposition testimony that he asked Biondo why no doctor had seen Holmes or why no one had sent him to the hospital four different times.

Biondo is not entitled to qualified immunity because Holmes has established that there are genuine issues of fact as to whether he received additional information about

Holmes' condition from Walker and failed to pass this information on to the medical staff. Therefore, a fact-finder could determine that Biondo was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

Second, there are also fact disputes as to whether Biondo had the ability to send Holmes to the hospital in an emergency situation, and whether it would have been obvious from the information he allegedly received from Walker <u>throughout</u> his shift that Holmes had a serious medical need. Therefore, a fact-finder could determine that Biondo was aware that Holmes had a serious medical need and acted indifferently by delaying or denying his access to medical care.

### b. Plonka and Furtah

<u>Plonka</u>:

Plonka says that he was not deliberately indifferent to Holmes' medical needs. First he says that he instructed Schwartz to move Holmes to an observation cell and fill out a medical request after Schwartz told him that Holmes had been exercising and doing pushups the previous night and complained that his arm was numb. Plonka says that he received no further information regarding Holmes' condition and therefore his conclusion that Holmes' condition was musculoskeletal was reasonable.

Schwartz testified at his deposition that he told Plonka that Holmes was having trouble walking and that he could not open up a milk carton; and he believes that he told him that Holmes also complained of numbness in his leg. Schwarz also says that he contacted Plonka's office and spoke with Furtah twice.

Plonka is not entitled to qualified immunity because Holmes has established that genuine issues of fact exist as to (1) what information he received from Schwartz regarding Holmes' condition, and (2) whether he received any additional information from Schwartz' alleged phone calls to his office, and (3) whether Plonka acted reasonably in failing to ask Furtah about Holmes after she returned to the office from the jail, considering that he had requested that someone fill out a medical request form. Therefore, a fact-finder could determine that Plonka was aware that Holmes' had a serious medical need acted indifferently by delaying or denying his access to medical care.

**Furtah**:

Furtah says that she was not deliberately indifferent to Holmes' medical needs because she never received a medical request regarding Holmes and she did not receive any phone calls from Schwartz.

Furtah further states that she is not a registered nurse, and had authority to send prisoners to the hospital without Plonka's approval only in very limited circumstances. Furtah says that since she is not a registered nurse, even if she had received all the information from Schwartz, she would not have recognized those as stroke symptoms or an emergency situation in which she could have acted without Plonka's instructions.

Schwartz says that he called Furtah twice with updates about Holmes worsening condition. Schwartz also says that Furtah told him the Plonka would see Holmes in the next morning.

Furtah is not entitled to summary judgment because Holmes has established that there exists genuine issues of facts as to whether (1) she received a medical request

form filled out by Witkowski; (2) whether she received calls from Schwartz with updates about Holmes' condition and (3) whether she failed to pass on any calls she received from Schwartz to Plonka. Therefore, a fact-finder could determine that Furtah was aware that Holmes' had a serious medical need acted indifferently by delaying or denying his access to medical care.

### B. The Claim Of Gross Negligence

The defendants argue that Holmes' claim for gross negligence should be dismissed for the same reasons as his §1983 claim should be dismissed. Holmes did not respond to these arguments. Accordingly, the defendants' motion is granted as to this issue.

### C. Whether St. Clair County Is Entitled To Summary Judgment

#### 1. The Standard For Municipal Liability

A municipality is liable under §1983 if its official policies or informal customs cause constitutional violations. Heflin v. Stewart County, Tennessee, 958 F.2d 709, 716 (6th Cir.1992). A municipality may have liability for the same actions for which public officials enjoy qualified immunity. Barber v. City of Salem, Ohio, 953 F.2d 232, 237-38 (6th Cir.1992).

To prevail under §1983, a plaintiff must show that the municipality, through a policy or custom, caused the alleged constitutional violation. Monell v. Dept. of Social Services, 436 U.S. 658 (1978). A municipality cannot be vicariously liable under § 1983 for a constitutional violation caused by its employees or agents. Id. at 694. Rather, a municipality can be liable under §1983 when a government's custom is "so permanent and well settled as to constitute a custom or usage with the force of law," Davenport v.

<u>Simmons</u>, 192 F.Supp.2d 812, 824 (W.D. Tenn. 2001), or when the government's official policy is the "moving force of the constitutional violation." <u>Monell</u> at 694.  <u>See also, Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986) ("municipal liability under §1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives....").

 In order to survive a motion for summary judgment on a §1983 claim, the plaintiff must adduce specific facts to support the claim; the plaintiff may not merely state conclusory allegations. <u>Culberson v. Doan</u>, 125 F. Supp.2d 252, 263-64 (S.D.Ohio 2000).

## 2.  Arguments

The County says that the contract between it and Plonka constitutes its policy regarding medical and health care services for prisoners.  The contract grants all discretion regarding medical services (including emergency services) to Plonka.  The contract requires that officers notify their supervisors when they become aware of a prisoner's medical problem.  The contract also provides that Plonka's assistant would act under his supervision.

The County argues that it should be granted summary judgment on the issue of municipal liability because policies similar to the contract between it and Plonka have been upheld by the Court of Appeals for the Sixth Circuit.  For instance, in <u>Graham v. County of Washtenaw</u>, F.3d 377, 383 (6th Cir. 2004), the court upheld a similar policy which allowed contracted medical personnel to "determine whether emergency services and/ or hospitalization are necessary."  The <u>Graham</u> court explained that,

> [I]t is not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails. Nor is it unconstitutional for municipalities and their employees "to rely on medical judgments made by medical professionals responsible for prisoner care." Ronayne v. Ficano, No. 98-1135, 1998 WL 183479, at *3 (6th Cir. Mar. 15, 1999) (unpublished opinion). In fact, most would find such a policy laudable in many respects. Not only does such a policy-like the one at issue in this case-allow prisoners to receive prompt health care from on-site doctors or nurses, it also ensures that an independent party, rather than a corrections officer, makes the critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted.

358. F.3d at 384.

The County argues that based on the similarity of its contract to the County of Washentaw's policy, Holmes has failed to meet his burden of demonstrating that any unconstitutional deprivation of medical treatment was due to its policy.

Holmes responds that Graham is distinguishable because in that case the nurses were (1) on-site, and (2) licensed. Holmes says that here, Plonka is not on-site everyday -- he visits the prison on Mondays, Wednesdays, and Fridays. Next, although Furtah visits the jail for a couple of hours every week day, she is merely an assistant with no formal training. Holmes says that these factors indicate that the County's contract is constitutionally infirm because the County has created a policy of (1) failing to train its officers to recognize the signs of a stroke by relying solely on its contracted medical staff; (2) delegating emergency medical decision to off-site medical providers; and (3) delegating emergency medical decision making to an unlicenced, untrained layperson (i.e. Furtah).

### 3. Resolution

Holmes has established that there is a genuine issue as to whether the County's policy of delegating medical decisions to Plonka under the contract constitutes a constitutional deprivation. In <u>Graham</u>, the court commented that there is a difference between a policy that is "otherwise sound [but] has been occasionally negligently administered" and a policy that is the "moving force" behind a violation. 358 F.3d at 377, citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 391 (1989). Here there is a genuine dispute as to whether the policy itself creates a constitutional violation. First, Plonka was not an on-site medical provider. Second, the County admits that Furtah was not licensed. Furtah testified that she made decisions about whether and what medical treatment prisoners should be given. The extent to which Furtah consulted with and obtained Plonka's approval in making medical decisions is disputed. To note, since Schwartz says that he called Furtah about Holmes' developing symptoms, and Plonka testified that he never learned of these calls, it is possible that Furtah made the decision that Plonka would not see Holmes' until January 28, 2004 entirely on her own.

## V.  CONCLUSION

For the reasons stated above:

(1) the defendants' motions for summary judgment as to Holmes' §1983

claim are DENIED, except as to defendant Stroh who is DISMISSED;

(2) the defendants motions for summary judgment as to Holmes' gross

negligence claim is GRANTED;

(3) the County's motion for summary judgement is DENIED; and

(4) Defendant Philip is DISMISSED.

SO ORDERED.


  s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  May 14, 2007


I hereby certify that a copy of the foregoing document was mailed to the parties
of record on this date, May 14, 2007, by electronic and/or ordinary mail.

  s/Julie Owens
Case Manager, (313) 234-5160